UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,

         vs.                                    **AFFIDAVIT OF**
                                               **BERNARD J. BEEBE**

BERNARD J. BEEBE,

                   Defendant
-----------------------------------------------------------X
STATE OF NEW YORK  )
                           ) ss.:
COUNTY OF ORANGE  )

     Bernard J. Beebe, being duly sworn, deposes and says:

     1.     I am the Defendant in the above-captioned matter.

     2.     My wife, Deborah, called me at about 7:00 a.m. while I was at my job in Long Island. I work at Classic Transportation in Long Island, New York as an Operations Manager. She told me that six (6) to eight (8) Federal Agents had come banging on the front door of our house in Maybrook, New York, at approximately 6:30 on the morning of August 23, 2006.

     3.     My wife said that she was terrified. She advised me that she was awoken while sleeping and was told by the agents that she could not get dressed, she could not call the local police to be at the house with her for comfort, and she could not immediately call me. Furthermore, she told me that they were taking all of our credit card records and our computers and that they had a search warrant for a list of other items. Also, she advised me that one of the agents was rude and sarcastic and made a statement that "it is funny that you were not surprised to see us."

     4.     I was scared out of my wits. My wife was very frightened. I did not know why the police were in my house seizing my property, and I did not know why they had a search warrant. I was also afraid my wife was being arrested. I believed that I had to do whatever

they told me to do. I was also very confused because I never spoke to the agents, but I felt they had an executed search warrant and my home had been violated.

5. Later, I spoke on the phone with one of the agents. He told me they wanted me to come down to lower Manhattan immediately to talk to them. Due to the tone of his voice, I felt that I had to cooperate with them.

6. On the way to Manhattan, I called and asked my wife to call the only lawyer we knew, our real estate lawyer, Tim McAdam, who is not a criminal lawyer. I asked my wife to ask him what I should say when I went to Manhattan. I never spoke to him, as I was in my car traveling to Manhattan to Homeland Security Headquarters. I called my wife back and asked what Mr. McAdam had told her. She said that Mr. McAdam told her that I should ask two questions: (1) Am I the subject of the investigation; and (2) Do I need a lawyer?

7. As I was driving from my job on Long Island to Homeland Security Headquarters, I was extremely nervous. I kept wondering what was going on. I have never been this nervous in all my life. I am a married man with six children and have never been in a police department in my life. I have no criminal record.

8. When I arrived at Homeland Security Headquarters, I was nervous because I was far from my wife. I did not know where my children were. My wife was so upset, I actually feared she would have a heart attack. From the tone of her voice, it sounded like she was almost hysterical. I felt as though I was entering a fortress. In order to receive an ID tag, to go into the building, I was forced to surrender my license to a guard. Now I felt I could not leave due to the fact that they had my drivers license. I really thought it could stop me from being able to leave. I understood that I could not leave without getting my license back and that I had to be escorted to be able to do this. I went down halls with doors that locked behind me and was escorted into a room by two agents who closed the door behind them. I believe they were locked. I was then moved to another larger room with a door that I believed was closed and locked behind me.

9. When I ultimately went down to Homeland Security Headquarters, I wanted to cooperate so that neither I, nor anyone in my family, would be in trouble. I knew there

some issues about a search warrant. I was never told that I was free to leave. I was told where to sit and was very intimidated by the agents' style and how they spoke to me. The room in which I was interrogated was barren. I really thought that without my drivers license I could not drive home. The agents sat down opposite me and from their tone and demeanor, I felt intimidated.

10. Approximately five minutes into the interrogation, Agent Radunski left the room. He returned with three pages of letter-size paper. Each page had black and white photo collages of naked teens. The same information is confirmed in the reports that Homeland Security sent to my attorney. In their account, these pictures were found on my computer. Agent Radunski told me that these pictures were illegal. I was shocked to see what they said they had found. At this point, I was sure that I was under arrest and would not be allowed to go home. I thought I had to cooperate.

11. The reasons I believed I was in custody was because at least six agents had come into my house and seized computers, credit card documents and other personal records. My wife had been verbally abused. When I called the agents at Homeland Security, from their tone I believed I had to travel to their offices in Manhattan to see them. When I arrived at Homeland Security Headquarters, in order to enter the building I had to surrender my license. As I proceeded to the location where I was to be interrogated, I believed door after door was locked behind me. When I first met with the agents, I was escorted from one conference room to another. When I entered the larger conference room, it was dark and barren. I was seated at a table with two agents in a room where the door was closed and possibly locked. At some point after sitting down with the agents, I was specifically confronted with three 8" X 11" photo collages of what appeared to be naked children. I was advised in an accusatory tone that the photos were illegal and had been found on my computer. The agents proceeded to question me for approximately 1 ½ hours and throughout that time, I did not feel free to leave. Once they said that the photos had come from my computer, I fully expected that I would be arrested and that I would not be free to leave.

12. I found it strange that towards the end of the interrogation, Agent Rudinski asked me for the password or codes to get into my computer. However, they had already said that they had taken these three pages from my computer. At that time, I wondered how that was possible.

13. After an hour of questions, the agents finished their interrogation. I only felt that I was not in custody when I was told at that point that I was free to leave.

BERNARD J. BEEBE

Sworn to before me this
5th day of February, 2008.

NOTARY PUBLIC

Linda McCarter
Notary Public, State of New York
No. 01MC4698975
Qualified in Orange County
Commission Expires April 30, 20__