Gary Greenwald *
Joanna C. Greenwald**
Joseph G. McKay
Marc R. Leffler ◊
William A. Frank

Ernio Poll
Benjamin Greenwald
Jamie C. Greenwald
David L. Gove
Robert E. Noe
Karen M. Alt ◊
Gary H. Forman**
Erica L. Powers,* ■
    LLM Taxation

David A. Brodsky, Of Counsel

Also Admitted To Practice In
* MA **NJ ◊CT ■MD

# GREENWALD LAW OFFICES

99 Brookside Avenue
Chester, New York 10918
(845) 469-4900 * Fax (845) 469-2022
Family Law Center Fax: (845)469-1895
Toll Free: 1-866-GREENWALD
www.GreenwaldLaw.com

*Please Reply to Chester Office*

Sullivan County
138 Sullivan Street
P.O. Box 266
Wurtsboro, NY 12790
(845) 888-2456
Fax: (845) 888-5606

New Jersey
PNC Bank Building
1 Garret Mountain Plaza - 6th Fl.
West Paterson, NJ 07424
(973) 754-0031
Fax: (973) 754-1331

James M. Neylon, *Paralegal*
(1934-1998)
Spencer M. McLaughlin, Esq.
(1945-2007)

April 14, 2008

Honorable Stephen C. Robinson, USDC
United States District Court
Southern District of New York
300 Quarropas Street, Room 633
White Plains, New York 10601-4150

    Re:    **United States of America v. Bernard Beebe**
               Case No.: 707-cr-00542-SCR

Honorable Judge Robinson:

      On March 27, 2008, I appeared before Your Honor for purposes of a hearing on the Defendant's motion to suppress statements. Present at the hearing were the Defendant, Bernard Beebe, his attorney Gary Greenwald Esq., of Greenwald Law Offices, and Richard Tarlowe on behalf of the United States Attorney's Office. At the hearing, the Court heard testimony from Special Agent Nicholas Raudenski. At the conclusion of the testimony, Your Honor asked if the parties wanted to submit a brief written summation, which the Defendant, through his attorneys, indicated he would. Therefore, the following is the summation in support of the defense.[1]

      In *Miranda v. Arizona*, the Supreme Court set forth a bright-line rule that a person must be advised that he has "the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed," before being subjected to custodial interrogation. *Miranda*, 384 U.S at 444, 86 S.Ct 1602.

      In determining whether a suspect was in custody, the courts look at all the circumstances surrounding the interrogation. The relevant inquiry is "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420. Custody

---

[1] We have ordered the transcript of the hearing. It is my understanding that the Court has a copy of the same. If, for any reason, the Court does not, the same will be supplied to the Court.

Honorable Stephen C. Robinson, USDC
Page 2
April 14, 2008

---

exists for Miranda purposes if a reasonable person in that position would "have felt he or she was not at liberty to terminate the interrogation and leave." *Thomson v. Keohane*, 516 U.S. 99.

In *United States v. Kirsh*, 54 F.3d 1062 (2d Cir), the Court stated:

> The test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable person would have understood herself to be subjected to restraints comparable to those associated with formal arrest, and (b) focuses upon the presence or absence of affirmative indications that the defendant was not free to leave. An accused is in custody when, even in the absence of an actual arrest, when law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave.

In making the custody determination, courts have looked at various factors. These factors include: whether a suspect is or is not told that he/she is free to leave, *see Campaneria v. Reid*, 891 F.2d 1014 (2d Cir.); the location and atmosphere of the interrogation, *see Oregon v. Mathiason*, 429 U.S. 492; the language and tone used by police, *see United States v. Guarno*, 819 F.2d 28 (2d Cir.); whether the suspect is searched, frisked or patted down, *see United States v. Wilson*, 901 F.Supp 172 (S.D.N.Y. 1995); and the length of the interrogation, *see Berkemer v. McCarty*, 468 U.S. 420.

These factors were set forth and applied in *Tankleff v. Senkowski*, 135 F.3d 235, a Second Circuit decision, in which the Court ultimately found the Defendant in custody after two hours of increasingly hostile questioning at the police station where police repeatedly questioned the suspect's credibility and confronted him with false evidence of his guilt.

In *Tankleff*, the Defendant agreed to go with the detective to the police station. Upon arriving, he was escorted by two detectives to a ten-foot by ten-foot, windowless room where he was interviewed continuously for two hours. During that time, he was subjected to increasingly hostile questioning, and detectives accused him of showing insufficient grief, stated that his story was "ridiculous" and "absurd" and that they simply "could not accept" his explanations. *Id* at 244. The detectives also lied and told the Defendant that his father had awoken from his coma and accused him of attacking him. *Id.* The Court concluded that under these circumstances, no reasonable person in Tankleff's position would have felt free to leave.

In the instant case, Mr. Beebe was called by agents of Homeland Security and directed to come speak to them. At the time they spoke to Mr. Beebe, the agents were in the process of executing a search warrant at his home. Mr. Beebe was advised by his wife that various items had been taken from his home, including computers. Mr. Beebe spoke to Agent Raudenski, who requested that he come to the Headquarters of Homeland Security in New York. Thereafter, Mr.

Honorable Stephen C. Robinson, USDC
Page 3
April 14, 2008

---

Beebe complied with the agent's request and traveled to their headquarters located in Manhattan.

Upon entering the building that housed the headquarters, Mr. Beebe went to the seventh floor, since that was the floor I.C.E is located on. On that floor, he went into a reception room which had a glass booth with an armed security guard on duty who exhibited a gun. Agent Raudenski described the area beyond the reception room as a "secure facility." Upon entering the "secure facility," Mr. Beebe was forced to surrender his drivers license and was provided with an ID tag.

In order to enter this "secure area," the agent had to use his identification card to electronically unlock the door to enter. Mr. Beebe was then escorted by Agent Raudenski, who was admittedly armed, to the third floor via the elevator. On the third floor, he was escorted to an additional waiting room that also had a glass booth with an armed guard behind it. Mr. Beebe was then led to an additional room in which the interview was conducted. Mr. Beebe sat down at a table and not one but two agents sat directly across from him. Then both agents interrogated him at the same time, meaning one agent would ask a question and then the other would ask a question or questions. Agent Raudenski admitted that prior to either agent questioning Mr. Beebe, he was not read his Miranda warnings. Essentially, the only warnings given was asking Mr. Beebe if he would like to answer some of Agent Raudenski's questions, which Mr. Beebe agreed to do. The specific questions about right to counsel, right to have an attorney, etc., as mandated by *Miranda*, were never asked, as admitted by Agent Raudenski.

Agent Raudenski admitted that Mr. Beebe asked the agents if he needed a lawyer. Although Mr. Beebe, through his affidavit, stated they told him "no," Agent Raudenski testified that they said, "it wasn't our position to tell him if he needed a lawyer or not." (Tr P. 40 L. 19) Most respectfully, it is urged that this request with respect to the need for an attorney was exactly what it states - a request for an attorney. The questioning, in and of itself, should have stopped after this request was made.

Agent Raudenski also admitted that Mr. Beebe asked if he was the subject of the investigation. Mr. Beebe, in his affidavit, stated they said "they were not sure," while Agent Raudenski testified, "we said it was an ongoing investigation into various websites, that his name was involved in the investigation, and we were there to get further information whether he was involved or not." (Tr. P. 41, L7-10). This statement is and was clearly untrue. Based upon the search of Mr. Beebe's home, as well as the prior investigation, it is obvious that he was, in fact, the target of the investigation and which was ultimately admitted by Agent Raudenski on the hearing. By stating this and responding in this fashion, it was the aim to keep my client in the custodial setting because if the question was answered truthfully, very likely Mr. Beebe would have asked to leave and, at that point in time, the questioning would have stopped unless Mr. Beebe was, in fact, arrested.

Honorable Stephen C. Robinson, USDC
Page 4
April 14, 2008

---

As the Court may recall, the agents then questioned Mr. Beebe about items they had allegedly recovered. Agent Raudenski testified that, "I showed him screen shots of the child pornography website that we had records of his purchase of." (Tr. P.44, L. 25) The interrogation continued for approximately a half hour more. At no time during the questioning did the agents advise Mr. Beebe that he was free to leave.

The Court may very well recall that early on in the interrogation, the Agents advised Mr. Beebe that they had found child pornography on his computers. During cross-examination, Agent Raudenski was asked, "In the initial onset of the conversation that you had with him, did you advise him that you had executed a search warrant because you were investigating issues of child pornography, and there was some evidence that he was involved with child pornography" to which he responded, "In sum or substance, yes." (Tr. P.79 L.3-7). Hence, at that point in time, minimally, Mr. Beebe was aware that a search warrant had been executed against his house and that the Government had removed computers. As such, Mr. Beebe was essentially advised, prior to looking at any photographs, that child pornography was found on his computers.

Furthermore, upon cross-examination, Agent Raudenski ultimately admitted that Mr. Beebe was the target of the investigation. In fact, Agent Raudenski replied, "yes, that's correct" when asked "[w]hen you went there, the person that you were targeting, the person that you were coming after to get information, was Bernard Beebe, isn't that true?" (Tr. P 55. L. 14-17)

When applying the factors used in determining custody, a reasonable person in Mr. Beebe's position would "have felt he or she was not at liberty to terminate the interrogation and leave." *Thomson v. Keohane*, 516 U.S. 99.

First of all, at no time throughout the course of the interview was Mr. Beebe ever told that he was free to leave. Even though it is clear that an agent need not do this, it is a factor that the Court should consider in applying the objective standard. If, in fact, Mr. Beebe was told that he was free to leave and remained, that could have potentially negated the issue of the Defendant being in a custodial setting. Since it was not said and other factors are in play, it is relevant in the Court's decision.

Secondly, the interview was conducted in a room located at the Homeland Security Headquarters. More importantly, this room was specifically described during testimony by Agent Raudenski as located within a "secure facility." In fact, in order to enter that room, Mr. Beebe had to surrender his drivers license, as well as pass two armed security personnel. Additionally, Agent Raudenski had to use his identification card to electronically unlock the door so that they could enter. Moreover, at all times, Mr. Beebe was escorted by Agent Raudenski, who was also armed and carrying handcuffs. Whenever Mr. Beebe was walking in the secured area, Agent Raudenski was physically next to him. Mr. Beebe was not walking around in a carefree fashion but, in fact, was in the physical presence and/or custody of Agent Raudenski.

Honorable Stephen C. Robinson, USDC
Page 5
April 14, 2008

At this point in time, considering all the circumstances, "a reasonable man in the suspect's position would have understood his situation" as if he were in custody. This is true in light of the fact that Mr. Beebe's house had been searched and agents had directed he come speak to them. Upon entering the facility, he was taken into a secure facility that was protected by two armed security personnel, as well as requiring electronic identification to access.

After entering the interview room, two federal agents sat directly across from Mr. Beebe and began questioning him. The use of two agents was obviously for the purpose of intimidating Mr. Beebe, notably Agent Fitzsimmons, who was closest to the only exit; therefore, he was essentially acting as a physiological block of the exit. Therefore, the manner in which the interview was conducted, including the position of the agents, as well as the fact that both asked questions, adds to the effect that a reasonable person would not feel at liberty to leave. One agent admitted Mr. Beebe was never given his Miranda warnings. Then the agents essentially informed Mr. Beebe both that he did not need an attorney and, more importantly, they lied to him when they said they were not sure if he was the subject of the investigation. In fact, Agent Raudenski admitted that he presented the Defendant with screen shots and told the Defendant they were records of his purchase. Moreover, they discussed the legality of such photos. Clearly, no reasonable person, after being presented with such photos, would feel that they were free to leave. The agents continually questioned Mr. Beebe regarding items allegedly removed from his home while executing a search warrant earlier that day.

Finally, the interview took place for approximately an hour and a half during which time Mr. Beebe never left the room. Based upon the police actions, including their manner and tone, the location and atmosphere of the room in which he was questioned, as well as the alleged evidence they showed him, a reasonable person would have felt as if he was not free to leave. Therefore, at the time Mr. Beebe was being questioned, this Court should find he was in custody.

The factors that the Court should consider in determining that Mr. Beebe was in custody are as follows:

(a)  A telephone call from his wife in which she advised that his home in Maybrook, New York, was being searched pursuant to a search warrant of a federal judge and/or magistrate (Tr. P.60, L.11-13);

(b)  Mr. Beebe being advised that the search warrant seized various computers and other documentation (Tr. P63. L.9-23);

(c)  A conversation with a stranger who happened to be a Homeland Security agent who requested that he come to the office located in New York City (Tr. P63. L.9-23);

(d) His appearance in New York City, following the direction of the agent (Tr. P 62, L.4-7), and his requirement to give identification and proof, which included walking into a secured area through a security clearance checkpoint (Tr. P 30, L.9-22);

(e) Being taken to a floor of Homeland Security Headquarters (Tr. P 31, L.15-17) and ultimately walking past a guard who exhibited a gun (Tr. P 72, L.13-14);

(f) Walking with Agent Raudenski, who was physically next to Mr. Beebe at all times while he was being walked into various interrogation rooms and ultimately coming to a relatively large one after first being in a smaller room (Tr. P 73, L.2-9);

(g) Going into an interrogation room where Mr. Beebe sat across from two agents (Tr. P 82, L.1-10), one of whom was between he and the door (Tr. P 81, L.19-20);

(h) The door being closed and possibly locked behind them (Tr. P 82, L.19-20);

(I) Being told that there was an ongoing investigation relative to child pornography and, in fact, that child pornography had been found on his computer (Tr. P.79 L.3-7);

(j) Being shown pictures of apparent child pornography websites while being interrogated (Tr. P. 44, L.25);

(k) At no time until he left was he told that he was, in fact, free to leave (Tr. P. 94. L.25, P95, L.1-2); and

(l) Agent Raudenski believed that Mr. Beebe was the target of his investigation (Tr. P 55. L. 14-17).

Most citizens of the United States do not have agents from Homeland Security coming to their homes with a search warrant and seizing items. A rational person would preliminarily believe that there was an excellent possibility that he/she was going to be charged criminally if a search warrant had been executed for their home. If the same person was directed to meet with the agents involved with the search warrant, was then placed in an enclosed location with armed guards, and then was advised that child pornography was found on his computer, an objective view of these facts, which have been stated in this letter, would surely bring an objective person to the conclusion where that individual would believe that he was in custody. As such, once again it is urged of the Court that Mr. Beebe be determined to have been in custody.

After making a finding that Defendant was in custody, there is no question that all evidence taken therefrom, including Mr. Beebe's statements, must be suppressed. This is true because the agent admitted that no Miranda warnings were given. As such, statements were

Honorable Stephen C. Robinson, USDC
Page 7
April 14, 2008

---

acquired in direct violation of Miranda and therefore, must be suppressed as a matter of law. *Miranda*, 384 U.S at 444, 86 S.Ct 1602.

Additionally, the consent to search that was purportedly executed by Mr. Beebe must also be found to be done in violation of his rights. Since it was taken while he was the subject of custodial interrogation and not having been given Miranda warnings, it was taken illegally. The failure to provide Miranda warnings must lead to the suppression of all evidence seized because they constitute fruits of the poisonous tree as a result of this illegal act. This would include any and all evidence seized pursuant to the purported consent to search that Mr. Beebe allegedly executed.

Most respectfully, based upon the facts set forth and found upon the hearing, the Defendant respectfully requests that the Court issue an order suppressing all of the statements that were given by the Defendant at the Homeland Security Headquarters interrogation site on August 23, 2006 and that all evidence derived from his consent to search be suppressed.

Respectfully yours,

Gary Greenwald

GG/aak

cc:   A.U.S.A. Richard Tarlowe

Gary Greenwald *
Joanna C. Greenwald**
Joseph G. McKay
Marc R. Leffler ◊
William A. Frank

Erno Poll
Benjamin Greenwald
Jamie C. Greenwald
David L. Gove
Robert E. Noe
Karen M. Alt ◊
Gary H. Forman**
Erica L. Powers,* ■
   LLM Taxation

David A. Brodsky, *Of Counsel*

Also Admitted To Practice In
* MA **NJ ◊CT ■MD

# GREENWALD LAW OFFICES

99 Brookside Avenue
Chester, New York  10918
(845) 469-4900 * Fax (845) 469-2022
Family Law Center Fax: (845)469-1895
Toll Free: 1-866-GREENWALD
*www.GreenwaldLaw.com*

*Please Reply to Chester Office*

Sullivan County
138 Sullivan Street
P.O. Box 266
Wurtsboro, NY 12790
(845) 888-2456
Fax: (845) 888-5606

New Jersey
PNC Bank Building
1 Garret Mountain Plaza - 6th Fl.
West Paterson, NJ 07424
(973) 754-0031
Fax: (973) 754-1331

James M. Neylon, *Paralegal*
(1934-1998)
Spencer M. McLaughlin, Esq.
(1945-2007)

April 15, 2008

Honorable Stephen C. Robinson, USDC
United States District Court
Southern District of New York
300 Quarropas Street, Room 633
White Plains, New York 10601-4150

   Re:   **United States of America v. Bernard Beebe**
         <u>Case No.: 707-cr-00542-SCR</u>

Honorable Judge Robinson:

   Pursuant to the Court's rules, I am providing this letter to explain that the within papers are being filed untimely herewith because of a problem or failure in the Court's electronic filing system..

   Please be advised that my secretary attempted to electronically file my summation letter on the Court's website on Monday, April 14, 2008 at approximately 4:30 p.m., which would have made the filing timely. However, she was unable to do so because the Court's website was down. My secretary called the number listed for ECF assistance and was advised that the website was, in fact, very slow. In speaking with A.U.S.A. Richard Tarlowe, he advised that he, too, was having difficulty in electronically filing his papers. Therefore, the decision was made to wait until this morning to attempt to electronically file the papers.

   Thank you.

                                              Respectfully yours,

                                              Gary Greenwald

aak

cc:   A.U.S.A. Richard Tarlowe