UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA          :

            - v. -                :     07 Cr. 542 (SCR)

BERNARD BEEBE,                    :

            Defendant.            :

- - - - - - - - - - - - - - - x


**POST-HEARING SUBMISSION BY THE UNITED STATES OF AMERICA
IN OPPOSITION TO THE DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**


                          MICHAEL J. GARCIA
                          United States Attorney for the
                          Southern District of New York
                          One St. Andrew's Plaza
                          New York, New York 10007


Richard C. Tarlowe
Assistant United States Attorney
      -Of Counsel-

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................................1

STATEMENT OF FACTS .......................................................................................................1

    A. The Investigation .........................................................................................................1

    B. The Search of the Defendant's Home..........................................................................3

    C. The Interview of the Defendant...................................................................................4

ARGUMENT ..........................................................................................................................10

    I.   THE COURT SHOULD DENY THE DEFENDANT'S MOTION
          BECAUSE THE DEFENDANT WAS NOT IN CUSTODY WHEN
          HE MADE STATEMENTS TO ICE AGENTS ON AUGUST 23, 2006 .......................10

        A. Applicable Law ......................................................................................................10

        B. Discussion..............................................................................................................11

CONCLUSION ......................................................................................................................24

## PRELIMINARY STATEMENT

Following an evidentiary hearing held on March 27, 2008, the Government respectfully makes this post-hearing submission in opposition to the defendant's motion to suppress statements he made to law enforcement agents on August 23, 2006. In his motion, the defendant claimed that suppression of his statements was warranted on two grounds: (1) the statements represented the fruits of an illegal search and (2) the defendant was not advised of his Miranda rights.[1]

The Court has already determined that the search of the defendant's home was lawful and that, therefore, his statements did not represent the fruits of an illegal search. Thus, the only issue left for the Court to decide is whether the lack of Miranda warnings on August 23, 2006 warrants suppression of the defendant's statements. As set forth below, the evidence presented at the March 27 hearing clearly established that the defendant was not in custody at the time he made those statements. Therefore, agents had no obligation to provide Miranda warnings and the Court should deny the remaining portion of the defendant's motion.

## STATEMENT OF FACTS

### A. The Investigation

On August 1, 2006, agents with the Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), including Special Agent Nicholas Raudenski, attempted to execute a search warrant at the defendant's home in Maybrook, New York. (Tr. at 15).[2] Upon arriving at the residence, however, agents discovered that no one was home. (Tr. at 16). The

---

[1]     The defendant also moved to suppress physical evidence recovered pursuant to a search of his home on August 23, 2006. The Court has denied that part of his motion.

[2]     "Tr." refers to the transcript of the March 27, 2008 hearing, and "GX" refers to government exhibits entered into evidence at the hearing.

agents learned from local law enforcement officers that Beebe and his family were out of town on vacation, and they decided not to execute the search warrant that day. (Tr. at 16-17).

The search warrant for the defendant's home was the product of an investigation conducted by ICE, termed Operation Underscore, which focused on a group of thirteen child pornography websites and the subscribers to those websites. (Tr. at 11). During the investigation, Agent Raudenski viewed each of the thirteen websites (Tr. at 11), and observed that they all had a similar layout and format. (Tr. at 12). Each website, for example, had three different "buttons" that a user could click – one to join the website, one for members who had already joined the website, and one for a free preview, or tour, of the website. (Tr. at 12). As part of his investigation, Agent Raudenski saved "screen shots" of the websites. (Tr. at 12, 13).

Agent Raudenski learned through his investigation that when a user clicked on the "join now" button, the user was redirected to a separate page that offered the user options to pay for 30 or 60-day subscriptions to the thirteen different websites. (Tr. 13-14; GX 4). That page advertised e-gold – a financial intermediary through which individuals could transfer money to the websites – as an easy and private way to join these thirteen websites. (Tr. at 14; GX 4). Agents obtained records from e-gold which showed that an e-gold subscriber named Bernard Beebe, who had provided the defendant's address, had transferred money to some of these websites. (Tr. at 15). In particular, the e-gold records showed that Beebe had purchased access to three of the thirteen websites, namely, CandyGirls, X-Lolitas, and Lolitas House. (Tr. at 15).

B. **The Search of the Defendant's Home**

On August 23, 2006, after learning that the defendant and his family had returned from vacation, ICE agents returned to the residence to execute a search warrant.[3] (Tr. at 17-18). That morning, agents gathered at a diner near the defendant's residence for a short briefing meeting at which Agent Raudenski advised them of the purpose of the search and provided the agents with their respective assignments. (Tr. at 18-19). At around 7:00 a.m., approximately six ICE agents, including Agent Raudenski, and two members of the New York State Police arrived at the defendant's residence. (Tr. at 19). The members of the State Police were in a car parked at the end of the street, approximately 30 to 40 yards from the house and did not enter the house at any point. (Tr. at 19-20). All law enforcement officers were in plainclothes and none of them had their weapons drawn at any point during the search. (Tr. at 20).

Agent Raudenski and the other ICE agents approached the house and rang the doorbell. (Tr. at 20). When the defendant's wife answered the door, agents identified themselves and informed her that they had a search warrant for the residence. (Tr. at 20). Although several children were home, the defendant was not present. (Tr. at 20). The defendant's wife informed the agents that he was in Long Island, and she explained that because he worked in Long Island, he stayed there during the week. (Tr. at 20-21).

While other agents searched the home, Agent Raudenski and Agent Fitzsimmons talked to the defendant's wife. (Tr. at 21-22). Mrs. Beebe and the two agents were seated around a table in the family's kitchen. (Tr. at 21-22). Agents located several computers in the home that day, and the defendant's wife told them that the defendant had given the family explicit

---

[3]     Because the initial search warrant that agents attempted to execute on August 1, 2006 had expired by this point, agents obtained another search warrant which they executed on August 23, 2006. (GX 5).

instructions not to use the computer located in their sons' bedroom.  (Tr. at 22-23).  According to

Mrs. Beebe, he told the family not to use that computer because he used it for work and it was

connected to his work mainframe.  (Tr. at 23).  Agent Raudenski subsequently learned, however,

that the computer was not connected to a work mainframe.  (Tr. at 23).

      Towards the end of the interview, the defendant's wife informed the agents of a storage

unit that the family rented.  (Tr. as 23-24).  She provided the name, address and phone number

for the storage facility, as well as the number of their storage unit.  (Tr. at 23-24).  However,

when the agents asked for consent to search that storage unit, she refused. (Tr. at 24).  When she

refused to provide consent, the agents simply moved on to something else.  (Tr. at 24).

### C.  **The Interview of the Defendant**

      While the agents were at the defendant's residence in Maybrook, Agent Raudenski spoke

to the defendant over the phone to try to arrange an interview.  (Tr. at 25).  Given the sensitive

and personal nature of the topic of child pornography, Agent Raudenski wanted to interview

Beebe in his own home as part of an effort to make Beebe feel most comfortable.  (Tr. at 17, 26).

However, the defendant informed Agent Raudenski that it would take him several hours to get

from where he was in Long Island to his house in Maybrook and that he was not planning to

return to Maybrook until the end of the week.  (Tr. at 25).  Therefore, Agent Raudenski and the

defendant arranged to meet later that day at Agent Raudenski's office in Manhattan.  (Tr. at 25).

During that phone call, Agent Raudenski did not tell the defendant he was under arrest, nor did

he tell the defendant that he would be arrested if he declined the interview.  (Tr. at 25).  Agent

Raudenski made no threats or promises at all.  (Tr. at 25-26).

      Following his telephone conversation with Agent Raudenski, the defendant drove from

his place of work in Long Island to the ICE office in Manhattan, unaccompanied by any law

enforcement officers.  The ICE office is located in an approximately 20-story building on West 26th Street in Manhattan.  (Tr. at 27).  The building is not a government building (Tr. at 27), and has no indications on the outside that there are any law enforcement offices on the inside.  (Tr. at 28).  There are, for example, no armed guards or law enforcement officers stationed outside the building.  (Tr. at 27).  The lobby of the building likewise lacks common indicators of a law enforcement office such as metal detectors, policemen or federal agents.  (Tr. at 28).  Rather, there is a general information booth that attends to all visitors to the building, whether they are visitors of ICE or of any other tenant in the building.  (Tr. at 28).  Of the approximately 20 floors in the building, ICE occupies only one entire floor and portions of just two other floors.  (Tr. at 27).  The building's other tenants include Hugo Boss, Tommy Hilfiger, Martha Stewart, fashion studios, and costume design businesses. (Tr. at 27).

After arriving, the defendant followed the same procedure that any visitor to ICE would go through, whether an Assistant United States Attorney, defense attorney, or interviewee.  (Tr. at 31).  That procedure, however, is vastly different than the procedure an arrestee would go through.  (Tr. at 31).  Like all visitors, Beebe accessed the reception area through two, side-by-side glass doors that are unlocked during business hours.  (Tr. at 28-29; GX 6).  Any member of the public can enter the reception area and need not be "buzzed" through the unlocked glass doors in order to enter.  (Tr. at 29).  The reception area has several couches, chairs and coffee tables (Tr. at 28-29; GX 7-9), and no one guards the door to the reception area.  (Tr. at 29).  Inside the reception area, there is also a glass partition with a security guard on the other side of the partition.  (Tr. at 29; GX 7).  According to the defendant's own sworn statement, he waited for Agent Raudenski for approximately 15 to 30 minutes.  (10/12/07 Beebe Aff. ¶ 7).

There is no evidence that his movement was restricted while he waited. Like any other visitor to ICE, the defendant presumably was asked for identification by the guard behind the glass partition. (Tr. at 30). The typical procedure for any visitor is that the guard issues a visitor's pass and, as a security measure, holds on to the person's identification as a type of "collateral" to ensure that the visitor returns the pass before leaving the building. (Tr. at 30). Once the visitor returns the pass to the guard, his or her identification is returned. (Tr. at 30).

After the defendant waited in the reception area, Agent Raudenski arrived and greeted the defendant. (Tr. at 31). Agent Raudenski introduced himself, shook Beebe's hand, and the two men exchanged pleasantries. (Tr. 67-68). Agent Raudenski then accompanied the defendant to the third floor via a common, public elevator. (Tr. at 31, 71). Upon arriving on the third floor, Agent Raudenski walked with Beebe through a public hallway occupied by other tenants of the building. (Tr. at 32). When they arrived at the ICE office on that floor, they entered through a door that had been closed, which led into a reception area. (Tr. at 32; GX 10). Like the waiting area on the seventh floor, the reception area on the third floor had a couch and coffee table, as well as a glass partition with a guard behind it. (Tr. at 32; GX 10).

Agent Raudenski then led Beebe through a second door that led to the main area of the office and that consisted of office cubicles. (Tr. at 32; GX 11). Although Agent Raudenski used a swipe card to open the two doors they had used to get to that point, the doors were not locked from the inside; that is, no key or access card is needed to exit through those doors. (Tr. at 32). Agent Raudenski did not lock the doors behind him. (Tr. at 32).

Once inside the main office area, Agent Raudenski and the defendant walked approximately five steps, past the office cubicles, to the conference room in which the interview took place. (Tr. at 34-35). At no point did they pass any holding cells or prisoners. (Tr. at 34).

6

Nor did they pass anyone who was in handcuffs or who was being fingerprinted or otherwise processed. (Tr. at 34). The conference room is approximately 30 feet by 15 feet, with a large, executive table in the center. (Tr. at 35; GX 12-15). There are approximately 15 leather swivel chairs around the table, and there are also several credenzas around the room. (Tr. at 35; GX 12-15). The room is well lit. (Tr. at 36; GX 12-15).

The conference room is used for conferences, presentations and group meetings, and is not considered an interrogation room. (Tr. at 36). Although ICE has interrogation rooms on the second floor of that same building, Beebe was never taken to the second floor that day. (Tr. at 36, 37). In contrast to the conference room in which Beebe was interviewed, the interrogation rooms are white, have nothing on the walls, contain a metal desk, and are not as well lit. (Tr. at 36). The doors to the interrogation rooms have a combination lock (Tr. at 36), and the rooms are surrounded by three holding cells, a metal detector, and prisoner processing equipment including a fingerprint booth. (Tr. at 37). As indicated, Beebe never was brought to that floor. (Tr. at 37).

Agent Fitzsimmons, Agent Raudenski, and Beebe were all seated around the conference table during the interview (Tr. at 37), which lasted approximately an hour and a half. (Tr. at 41). During the interview, the door to the conference room was closed but unlocked. (Tr. at 38). Both agents were wearing plainclothes. (Tr. at 38). Although Agent Raudenski had a weapon on him, it was concealed, as were his handcuffs. (Tr. at 38). The agents never searched the defendant nor confiscated any of his possessions. (Tr. at 39). The defendant was never frisked, fingerprinted or handcuffed. (Tr. at 39). No one told him that he was under arrest or that he was not allowed to leave. (Tr. at 39). No one prevented him from leaving or otherwise restricted his movement (Tr. at 39). At no point was Beebe ever threatened. (Tr. at 39).

7

In fact, at the outset, Agent Raudenski explained to Beebe that his participation in the interview was completely consensual, meaning he did not have to answer any questions he did not want to. (Tr. at 40). Beebe stated that he understood this, and he agreed to speak to the agents. (Tr. at 40). Although Beebe was not read Miranda warnings, he was not formally arrested that day, nor did Agent Raudenski intend to arrest him that day. (Tr. at 40).[4]

The defendant even asked two of his own questions at the beginning of the interview. First, he asked if he needed an attorney. (Tr. at 40). Agent Raudenski told Beebe that the agents could not make that decision for him, but that he had the right to have an attorney present during questioning if he wanted. (Tr. at 40). Agent Raudenski never told Beebe that he did not need a lawyer or that he could not have a lawyer present. (Tr. at 40-41). Beebe also asked the agents if he was the subject of their investigation. (Tr. at 41). Agent Raudenski told Beebe that his name had come up in their investigation, but that the investigation was ongoing and they wanted to gather additional information to ascertain whether he was involved or not. (Tr. at 41).

The agents began by discussing innocuous topics with Beebe, such as his living arrangements, to try to get him comfortable answering questions. (Tr. at 41-42). Over time, the interview transitioned to other topics, including computers, Internet usage, credit card purchases, pornography, and child pornography. (Tr. at 42). Agent Raudenski described the defendant's demeanor as "very engaging, leaning forwards like he wanted to participate in the interview, wanted to talk to us." (Tr. at 42).

During the interview, Beebe stated that he was the only one who used the computer in his sons' bedroom and that, although he told the family he used it for work, he also used it to view

---

[4]     While assigned to ICE's child exploitation unit, Agent Raudenski participated in the execution of approximately 40-50 search warrants, and nearly every time, a subject was interviewed by an agent. (Tr. at 26). None of those people were arrested on the day of the search. (Tr. at 26).

pornography. (Tr. at 42-42). He stated that he had seen child pornography on the Internet and that he had downloaded from child pornography websites. (Tr. 43-44). He said that of the multiple computers in the house, the only one he did not use for pornography was the one used by the children. (Tr. at 44). A later forensic analysis of the computers seized from the home revealed child pornography on all the computers except for the one identified as the one the children used. (Tr. at 44).

Towards the end of the interview, Agent Raudenski showed Beebe printouts of the "screen shots" Agent Raudenski had saved of the CandyGirls, X-Lolitas, and Lolitas House websites – i.e., the websites to which Beebe had purchased access, according to the e-gold records. (Tr. at 44-45; GX 1-3). Although Agent Raudenski printed the screen shots out that day to show them to Beebe, he had saved them onto disks months before that. (Tr. at 45). When Beebe was asked if he recognized the websites shown in the screen shots, he said one of them looked familiar. (Tr. at 46). Agent Raudenski testified that he had no doubt in his mind that he showed the screen shots to Beebe towards the end of the interview. (Tr. at 46-47). Agent Raudenski never told Beebe that these screen shots, or anything else for that matter, had come from any computers seized that day from the defendant's home. (Tr. at 46).

Before the interview concluded, Agent Raudenski asked Beebe for consent to search his e-mail account. (Tr. at 47). Beebe verbally provided consent, then read and signed a written consent form. (Tr. at 47). Above Beebe's signature, the form read, "The written permission is being given by me to the above Officers voluntarily, without promises or threats being made." (GX 16; Tr. at 48).

At the conclusion of the interview, the agents told Beebe that they might have some follow-up questions, and he indicated that he would be willing to speak to them again. (Tr. at

49).  He was escorted back to the seventh floor, and he then left the building.  (Tr. at 49).  To do so, he used the same common, public elevator bank that he used to get there in the first place.  (Tr. at 49, 71).  During the interview, the defendant never asked if he could leave, nor did he ever attempt to leave.  (Tr. at 41).

## ARGUMENT

**I.    THE COURT SHOULD DENY THE DEFENDANT'S MOTION BECAUSE THE DEFENDANT WAS NOT IN CUSTODY WHEN HE MADE STATEMENTS TO ICE AGENTS ON AUGUST 23, 2006**

The defendant claims that when he met with ICE agents on August 23, 2006, he was subjected to custodial interrogation without being advised of his Miranda rights.  Although agents did not provide Miranda warnings to the defendant on August 23, 2006, the law plainly did not require them to do so.  The evidence at the hearing clearly established that the defendant was not in custody when he made statements to law enforcement agents that day.  Therefore, no basis exists for suppression of those statements.

### A.  Applicable Law

Law enforcement authorities are not required to provide Miranda warnings every time they interview someone.  Oregon v. Mathiason, 429 U.S. 492, 495 (1977).  This is true even if the interview takes place at a police station and even if the investigation has reached the point where the person being questioned is the subject of the investigation.  See id.  In fact, "Miranda warnings need not be given even if the government's criminal investigation has reached the stage where the defendant is the focus of inquiry."  United States v. Burke, 700 F.2d 70, 84 (2d Cir. 1983).

Law enforcement authorities must, however, advise an individual of his Miranda rights if two preconditions are met, namely, custody and interrogation.  See Thompson v. Keohane, 516

U.S. 99, 102 (1995).  Thus, "<u>Miranda</u> warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'"  <u>Mathiason</u>, 429 U.S. at 495. "[A] custodial setting is one providing inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak." <u>United States v. Mitchell</u>, 966 F.2d 92, 98 (2d Cir.1992) (internal quotation marks omitted).

The Second Circuit has explained that "[t]he test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable person would have understood herself to be 'subjected to restraints comparable to those associated with a formal arrest,' and (b) 'focuses upon the presence or absence of affirmative indications that the defendant was not free to leave.'"  <u>United States v. Kirsh</u>, 54 F.3d 1062, 1067 (2d Cir. 1995) (quoting <u>Mitchell</u>, 966 F.2d at 98).  In determining whether an individual is in custody for <u>Miranda</u> purposes, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting <u>Mathiason</u>, 429 U.S. at 495).  Where there is no actual arrest, "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so."  <u>United States v. Guarno</u>, 819 F.2d 28, 31-32 (2d Cir. 1987) (quoting <u>United States v. Hall</u>, 421 F.2d 540, 545 (2d Cir. 1969)).

**B.  <u>Discussion</u>**

The narrow issue presented for the Court is whether the defendant was "in custody" when he made statements to ICE agents on August 23, 2006.  The evidence at the hearing clearly established that the defendant had no objectively reasonable basis to believe he was in custody. He went to the ICE office for the interview voluntarily and unaccompanied by any agents.  He

initially waited in a reception area for approximately 15 to 30 minutes, before being interviewed in a large, executive-type conference room by two agents in plainclothes who had no weapons drawn or even visible. He was not formally placed under arrest at any time during the interview, nor was he subjected to any sort of restraints that are even remotely comparable to that of a formal arrest. He was not frisked, searched, handcuffed or fingerprinted, nor did he even walk past any holding cells or prisoners. He was not told he was under arrest and his movement was not restricted. Before the interview concluded, he signed a written consent form, voluntarily agreeing to permit agents to search his e-mail account. When the interview concluded, he stated he would be willing to answer follow-up questions if they had any, and he left the building through the same public elevators he used to get to the ICE office in the first place. In sum, the totality of the circumstances makes clear that the defendant was not subjected to custodial interrogation. In fact, the circumstances surrounding the defendant's interview contained none of the indicia of a custodial environment.

Defense counsel conceded, at oral argument prior to the hearing, that the defendant went to the ICE office voluntarily (2/1/08 Transcript, Ex. 2 to 2/8/08 Greenwald Letter, at 11), and the testimony at the hearing confirmed this fact. When Agent Raudenski spoke to the defendant on the phone to request an interview, Agent Raudenski never told the defendant that he was under arrest or that he would be arrested if he refused to meet with the agent. (Tr. at 25). In fact, Agent Raudenski made no threats or promises to get the defendant to meet with him. (Tr. at 25-26). According to the defendant, during his lengthy trip from Long Island to Chelsea, in which he was unaccompanied by any law enforcement agents, he even had an opportunity to talk to his wife after she had spoken to an attorney at his request and on his behalf. (2/5/08 Beebe Aff. ¶ 6).

That the defendant went to the office voluntarily, unaccompanied by any law enforcement agents, weighs strongly against a finding that he was in custody. See United States v. Kirsteins, 906 F.2d 919, 923-24 (2d Cir. 1990); see also Mathiason, 429 U.S. 492 at 495 (defendant not in custody where he voluntarily went to police station); United States v. Cota, 953 F.2d 753, 756-59 (2d Cir. 1992) (defendant not in custody where she agreed to go to police station voluntarily out of concern for the return of her seized car, even though she initially was removed from her car at gunpoint and handcuffed). In Kirsteins, the Second Circuit held that the defendant was not in custody when he attended an interview at the U.S. Attorney's Office, even though he did so only after receiving a formal letter, on Department of Justice letterhead, which was delivered by overnight mail, requesting his presence for an interview on a specific date and at a specific time. Kirsteins, 906 F.2d at 923-24. The district court found that the defendant was in custody, relying in part on the contents of the letter and its method of delivery. See id. The Second Circuit reversed, however, emphasizing that the letter did not suggest any compulsion or sanction for failure to comply. Id. Likewise, in this case, there was no suggestion of compulsion or sanction if the defendant declined Agent Raudenski's request over the phone for an interview.

Even when the defendant arrived at the ICE office, there was nothing exceptional about the surroundings, or his visit to those surroundings, which would have caused "a reasonable person" to believe he was "subjected to restraints comparable to those associated with a formal arrest." Kirsh, 54 F.3d at 1067. Indeed, the Supreme Court has held that questioning does not become custodial merely because it takes place in a police station. Mathiason, 429 U.S. at 495. In this case, although the questioning technically took place in a law enforcement office, it is difficult to conceive of a less intimidating "police station" than where Beebe was interviewed.

13

The building in which the interview took place is not a government building and, in fact, its tenants include such companies as Hugo Boss, Martha Stewart and Tommy Hilfiger. (Tr. at 27). There are no law enforcement officers stationed outside the building or in the lobby, nor is there even a metal detector in the lobby. (Tr. at 27-28). The main reception area for ICE is on the seventh floor and it has couches, chairs and coffee tables. (Tr. at 28-29; GX 6-9). The glass doors that lead to the reception area are unlocked and unguarded. (Tr. at 29). According to Beebe himself, he waited for 15 to 30 minutes before Agent Raudenski even arrived. (10/12/07 Beebe Aff. ¶ 7). This, too, weighs against a custodial finding. See Kirsteins, 906 F.2d at 922, 924 (finding defendant not in custody where he waited in reception area for approximately 15 minutes before being interviewed).[5]

Beebe was eventually greeted in the reception area by Agent Raudenski, who led him to another ICE office on the third floor of the same building via a common, public elevator. (Tr. at 31, 71). Once they arrived on the third floor, they walked through a common hallway, past offices belonging to other tenants. (Tr. at 32). When they arrived at the ICE office on that floor, they first walked through a small reception area, which led to a short hallway with office cubicles. (Tr. at 32; GX 10, 11). After walking a few steps past those cubicles, they reached the conference room in which the interview took place. (Tr. at 33, 35). The defendant never walked

---

[5]     The defendant alleged in his second, supplemental affidavit that he was "forced to surrender" his identification to obtain a visitor's "tag." (2/5/08 Beebe Aff. §§ 8, 11). In addition to the fact that the defendant's affidavit should not be credited because his statements were not subjected to cross-examination, see p. 22 below, Agent Raudenski testified that all visitors, whether prosecutors, defense attorneys or suspects, go through the same procedure. (Tr. at 31). Specifically, the visitor gives the security guard his or her identification in return for a visitor's pass. (Tr. at 30). To ensure return of the visitor's pass, the guard holds on to the visitor's identification as a sort of "collateral" until the visitor returns the visitor's pass. (Tr. at 30). It would be far more reasonable for a person in Beebe's position to understand that this was a measure intended for security rather than believing it was a restraint on his leaving, see Kirsteins, 906 F.2d at 924, particularly given that the door to the room is unlocked and unguarded. (Tr. at 29).

past any holding cells, prisoners, people in handcuffs, or people being fingerprinted or otherwise processed.  (Tr. at 34).

To the extent there was anything remarkable about the conference room, it was its lack of any resemblance to an interrogation room.  It contained no features that an objectively reasonable person would associate with a formal arrest.  It is a large, well-lit room with a large, executive table, and approximately 15 leather, swivel chairs surrounding the table.  (Tr. at 35, 36; GX 12-15).  Not surprisingly, the conference room is used for conferences and meetings.  (Tr. at 36).  Agent Raudenski's choice to use this room for the interview is consistent with his approach of trying to make Beebe feel comfortable.  (Tr. at 17).  Indeed, although ICE maintains interrogation rooms on a different floor of the same building, which are smaller and darker, and are surrounded by holding cells, Beebe was never taken to that floor.  (Tr. at 36-37).  Had the agents wanted to create a less comfortable or more intimidating environment, they clearly had a readily available means to do so.[6]

Although the guard who sits behind a glass partition in the reception area carries a weapon, there is no evidence to suggest that his weapon was visible to the defendant or that the defendant was aware the guard was armed.  (Tr. at 72).  Indeed, neither of the defendant's affidavits submitted in support of his motion make any reference to seeing an armed guard, and it is difficult to imagine that if the defendant had seen a weapon, he would have omitted that from both affidavits.  Moreover, although the defendant repeatedly alleged in his supplemental affidavit that certain doors locked behind him (2/5/08 Beebe Aff. ¶ 8), there is no evidence to

---

[6]     Although the subjective views of the agent are not directly relevant to the objective standard that the Court must apply, see Stansbury v. California, 511 U.S. 318, 323 (1994), the agent's choice to use the conference room rather than an interrogation room is relevant because it undermines the credibility of Beebe's allegations in his affidavits that the agents acted in an intimidating way, and further supports the agent's overall description of events that day.

suggest that such a belief, if actually held by Beebe, was objectively reasonable.  In fact, although the doors are locked from the outside and require a swipe card to enter, the doors are not locked from the inside (Tr. at 32-33), and Agent Raudenski did nothing to suggest he was locking the doors behind him.  (Tr. at 38).  In any event, a reasonable interpretation of these measures was that "they were intended for security rather than for detention purposes." Kirsteins, 969 F.2d at 924 (holding that defendant was not in custody even though he encountered guards at a security station upon entering the building and even though he was aware that one could access the inner office where he was being interviewed only if "buzzed" through a security door; reasonable to perceive such measures as intended for security, not detention).

Once inside the conference room, Agent Raudenski and Agent Fitzsimmons spoke with the defendant for approximately an hour and a half.  (Tr. at 41).  During that time, the agents gave no "affirmative indications" – through their words or actions – "that the defendant was not free to leave," nor did they do anything that would have led a reasonable person to believe he was "subjected to restraints comparable to those associated with a formal arrest."  Kirsh, 54 F.3d at 1067.

They never told the defendant he was under arrest or that he could not leave, nor did they restrict his movement in any way.  (Tr. at 39).  Indeed, there is no evidence that they did anything which reasonably could be taken as intimidating or coercive, let alone restricting Beebe's freedom of action.   Significantly, Beebe was never subjected to any of the things typically associated with a formal arrest.  See United States v. Newton, 369 F.3d 659, 676 (2d Cir. 2004) (holding that defendant who was questioned while handcuffed was in custody; "Handcuffs are generally recognized as a hallmark of a formal arrest.").  Beebe was never even

frisked, much less searched, fingerprinted, or handcuffed. (Tr. at 39). The agent's weapon and handcuffs were not even visible to Beebe, and the agents did not seize anything from Beebe. (Tr. at 38, 39).

The agents began the interview by telling him that he did not have to answer any questions. (Tr. at 40). Beebe stated that he understood this, and agreed to talk to the agents. (Tr. at 40). The defendant even asked two of his own questions before the questioning began. (Tr. at 40, 41). He asked whether he needed a lawyer and whether he was the subject of their investigation. (Tr. at 40, 41). Far from conveying the message that Beebe was under arrest, Agent Raudenski told Beebe that his name had come up in their investigation, but that the investigation was ongoing and they wanted to gather additional information to ascertain whether he was involved or not. (Tr. at 41). It simply was not reasonable, particularly in light of all the other circumstances, for Beebe to believe he was in custody when, according to his own sworn statement, he was told it was difficult to tell if he was the subject of the agents' investigation. (10/12/07 Beebe Aff. ¶ 10).

Moreover, the defendant's demeanor during the interview did not appear to be that of someone who felt intimidated or believed he was in custody or under some compulsion to take part in the interview. Agent Raudenski described the defendant's demeanor as "very engaging, leaning forwards like he wanted to participate in the interview, wanted to talk to us." (Tr. at 42). In fact, in his affidavit, even the defendant acknowledges that "[w]hen I ultimately went down to Homeland Security Headquarters, I wanted to cooperate so that neither I, nor anyone in my family, would be in trouble." (2/5/08 Beebe Aff. § 9) (emphasis added). There is obviously a meaningful distinction between someone "want[ing] to cooperate" and feeling compelled or coerced to do so. See Mitchell, 966 F.2d at 98-99 (holding defendant not in custody where,

among other things, he was cooperative and willingly divulged information); <u>Cota</u>, 953 F.2d at

758-59 (holding defendant not in custody where she freely volunteered information after going

to police station out of concern for the return of her seized car, she did not appear intimidated

during the questioning, and she did not ask that the questioning cease).

      Furthermore, towards the end of the interview, agents asked Beebe for his consent to

search his e-mail.  (Tr. at 47).  Beebe provided verbal consent, and was then given a written

consent form which he read and then signed.  (Tr. at 47).  Above Beebe's signature, the form

read, "The written permission is being given by me to the above Officers <u>voluntarily, without</u>

<u>promises or threats being made</u>."  (GX 16; Tr. at 48) (emphasis added).  This further evidences

Beebe's desire to cooperate with agents that day, voluntarily and without any promises or threats.

      When the interview was over, the agents said they might have some follow-up questions,

and Beebe said he would be willing to answer more questions.  (Tr. at 49).  He was permitted to

leave, and he left through the same public elevator bank he had used to get there in the first

place.  (Tr. at 49).  During the interview, Beebe never tried to leave, and never asked if he could

leave.  (Tr. at 41).  Nor did anyone prevent him from leaving or otherwise restrict his movement.

(Tr. at 39).

      Although analogous to the circumstances in <u>Kirsteins</u>, the circumstances here were

actually <u>less</u> custodial than those in <u>Kirsteins</u>, a case in which the Second Circuit held that the

defendant was not in custody.  In <u>Kirsteins</u>, the defendant was interviewed at the U.S. Attorney's

Office after receiving an official letter from the Department of Justice requesting his presence at

a specific date and time.  906 F.3d at 921.  When he arrived at the building, he encountered a

security station with two guards, who allowed him to proceed.  <u>Id.</u> at 922.  Prior to the interview,

he waited approximately 15 minutes in a reception area.  <u>Id.</u>  During that time, he observed that in

order to access the interior office, people had to be "buzzed" in through a locked security door.
Id. at 922.  A stenographer was present for the interview, and the defendant was sworn in by the
stenographer at the start of the interview.  Id.  The facts of that case diverge most significantly
from those here when Kirsteins asked, after about an hour of questioning, if he could go outside
to tell his driver to continue waiting for him.  Id.  When Kirsteins made that request, one of the
government lawyers stated, "I'm going with you," and did, in fact, accompany the defendant to
the street and back.  Id.  Although nothing even approaching that occurred here, the court in
Kirsteins still held that the defendant was not in custody.  Id. at 924.

　　　The evidence at the March 27 hearing established that no circumstances existed here that
could have reasonably led Beebe to believe he was subjected to the type of restraints associated
with a formal arrest.  Prior to the hearing, at the February 1, 2008 oral argument on the
defendant's motion, the Court provided the defendant an opportunity to supplement his earlier
briefs by pointing out any cases he believed to be factually analogous to his.  Tellingly, although
the defendant submitted a six-page letter in response, he identified only one case that purportedly
contains facts analogous to those here – Tankleff v. Senkowski, 135 F.3d 235 (2d Cir. 1998).
(2/1/08 Letter from Gary Greenwald to Hon. Stephen C. Robinson at 4).  The facts in Tankleff,
however, are entirely inapposite to the facts of this case.  In Tankleff, the police responded to
Tankleff's 911 call from his family's residence, where they found his mother murdered and his
father unconscious and severely wounded.  Id. at 240.  The police interrogated Tankleff, who
was seventeen years old, for several hours, first in a police car at the scene and then at the police
station where he was taken by detectives.  Id.  The interrogation became increasingly hostile, as
the police pointed out inconsistencies in his story, told him that his account was "ridiculous" and
"absurd," and stated that they "could not accept his explanations."  Id. The defendant persisted in

19

denying any involvement until officers falsely told him that his father had awoken from a coma and accused him of the attacks. Id. at 241.

There is no evidence of anything here that even approaches the type of circumstances present in Tankleff.  Incredibly, in his February 8 letter to the Court, the defendant claimed that when the agents showed Beebe screen shots of three websites to which they believed he had purchased access, that event was "most similar to issues that were presented in Tankleff." (2/8/08 Greenwald Letter at 4).  In addition to the fact that no evidence exists in the instant case of a hostile interview, the agents' actions in showing Beebe those screen shots is not even remotely comparable to detectives telling Tankleff, shortly after such a traumatic experience, that his father had awoken from a coma and accused him of the attack.

Moreover, the defendant also asserted in his February 8 letter that Agent Raudenski took part in a "ruse" similar to the one utilized by the detectives in Tankleff when he supposedly told Beebe that those screen shots had come from his computer. (2/8/08 Greenwald Letter at 4-5). That allegation, however, is belied by the evidence.  The agents never presented Beebe with any false evidence of his guilt, much less something akin to falsely telling a seventeen-year old whose mother was just murdered and his father severely injured that his father had awoken from a coma and identified him as the perpetrator.  Rather, Agent Raudenski truthfully informed Beebe what the screen shots represented, and never told Beebe that the screen shots, or anything else for that matter, had come from computers seized that day.  (Tr. at 46).  In any event, presenting a suspect with potentially incriminating evidence does not create a custodial environment.  See Mathiason, 429 U.S. at  493, 495-96 (holding that police officer's false statement to defendant that his fingerprints were found at the scene of the crime "has nothing to do with whether [defendant] was in custody for purposes of the Miranda rule"); see also Guarno,

819 F.2d at 30, 32 (holding that defendant who was confronted with "very extensive" and "overwhelming" evidence of his guilt was not in custody); Mitchell, 966 F.2d at 98-99 (defendant not in custody even though interrogation grew "heated" and defendant was told not to lie).

During the February 1, 2008 oral argument on the defendant's motion, defense counsel also sought to place great emphasis on the fact that the defendant's home had been searched prior to the interview. This fact, however, does not convert the interview into a custodial interrogation. Indeed, although the Court asked defense counsel to submit citations to cases supporting his view of the significance of the search, defense counsel cited no such case in his February 8 response. Nor is the Government aware of any authority holding that where a search warrant is executed at a subject's home, a subsequent interview of that subject becomes custodial.

Indeed, in United States v. Kirsh, 54 F.3d 1062, the Second Circuit affirmed the district court's holding that the defendant was not in custody when she made incriminating statements to officers immediately following a search of her home. In Kirsh, eight agents entered the apartment of the defendant and her husband, with guns drawn. Id. at 1067. The defendant and her husband were taken outside into the hall, where her husband was handcuffed and arrested. Id. at 1067. The defendant was not handcuffed, but she was not permitted to enter the apartment. Id. at 1067. Upon completion of the search, agents asked her to sign an inventory of items seized from the home, and then questioned her. Id. at 1067. During that questioning, she made incriminating statements which she later moved to suppress. The Second Circuit affirmed the district court's denial of her motion to suppress because she was not in custody when the statements were made. Id. at 1068.

In the instant case, there is simply no evidence of anything remotely close to the types of restraints associated with a formal arrest.  Compare Newton, 369 F.3d at 676-77 (custody established where defendant was questioned while handcuffed); United States v. Uribe-Velasco, 930 F.2d 1029, 1033 (2d Cir. 1991) (custody established where, among other things, officer approached defendant from behind, identified himself and others as police officers, told defendant not to move, and kept his hand on defendant's back while questioning him, and eight other agents arrived on the run and positioned themselves all around with their guns drawn).

The defendant did not testify at the hearing, but instead seeks to rely on his affidavits submitted in support of his motion.  Those affidavits, however, are replete with assertions about his subjective understandings, which are irrelevant to the determination of whether an objectively reasonable person would have believed himself to be subject to the type of restraints associated with a formal arrest.  See Kirsteins, 906 F.2d at 923.  Moreover, where, as here, a defendant chooses not to testify at a suppression hearing, the Court should credit the live testimony over the moving affidavit.  See, e.g., United States v. Al Marri, 230 F. Supp. 2d 535, 539 (S.D.N.Y. 2002) (valuing live testimony "over the contents of a defendant's affidavit" because the defendant was not subject to cross-examination); United States v. Juliano, No. 99-1197, 2000 U.S. Dist. LEXIS 12149, *14 n.4 (S.D.N.Y. 2000) ("[B]ecause defendant did not testify at the hearing and was not subject to cross-examination . . . the Court gives little weight to defendant's assertion"); United States v. Frank, 8 F. Supp. 2d 284, 291 n.2 (S.D.N.Y. 1998) ("Since [the defendant] did not testify at the hearing, and was not subject to cross-examination, the Court was unable to form an opinion as to his credibility or the truthfulness of his allegations.")

Here, the evidence raises serious questions about the credibility of a number of assertions in the defendant's affidavits.  For example, in light of the evidence at the hearing, his claim that he felt as though he was entering a "fortress" when he arrived at the ICE office is suspect.  (2/5/08 Beebe Aff. ¶ 8).  Likewise, the defendant's description of the conference room in which the interview took place as "dark and barren" (2/5/08 Beebe Aff. ¶ 11) is directly contradicted by the evidence.  (GX 12-15; Tr. at 35-37).  In his affidavit, the defendant repeatedly refers to doors that locked behind him (2/5/08 Beebe Aff. ¶ 8), but there is no evidence of an objectively reasonable basis to believe that any of the doors locked behind him.  In fact, Agent Raudenski did not lock them, and they were not locked from the inside.  (Tr. at 32).

It is also noteworthy that in the defendant's second affidavit, he portrayed the agents' showing him the screen shots as a significant and crucial moment in the interview – i.e., "[a]t this point, I was sure that I was under arrest and would not be allowed to go home."  (2/5/08 Beebe Aff. ¶ 10) (emphasis added).  In his initial affidavit, however, he never even mentioned the screen shots at all, but rather, stated that he felt he was under arrest and not free to leave the whole time.  (10/12/07 Beebe Aff. ¶ 12-13).  In his second affidavit, Beebe stated that he was shown the screen shots approximately five minutes into the interview.  (2/5/08 Beebe Aff. § 10).  Agent Raudenski, however, testified that he showed Beebe the screen shots towards the end of the hour and a half interview, and stated that there was no doubt in his mind about that. (Tr. at 46-47).

## <u>CONCLUSION</u>

The evidence at the hearing clearly established that the defendant had no objectively reasonable basis to believe he was subjected to the type of restraints associated with a formal arrest.  He was not formally placed under arrest at any time during the interview, nor was he subjected to any sort of restraints that are even remotely comparable to that of a formal arrest. Because the totality of the circumstances makes clear that the defendant was not subjected to custodial interrogation on August 23, 2006, the Court should deny his motion to suppress the statements he made that day.

Dated: New York, New York
      April 14, 2008

                          Respectfully submitted,

                          MICHAEL J. GARCIA
                          United States Attorney for the
                          Southern District of New York

            By:  <u>s/  Richard C. Tarlowe</u>
                     Richard C. Tarlowe
                     Assistant United States Attorney
                     (212) 637-2330 (phone)