UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

BERNARD BEEBE

07 CR 542 (SCR)

DECISION AND ORDER

---

STEPHEN C. ROBINSON, United States District Judge:

The Defendant, Bernard Beebe, was indicted on one count of possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and one count of receiving and distributing child pornography in violation of 18 U.S.C. § 2252A(a)(2)(B). Before this Court is the Defendant's motion for an order suppressing statements he claims were made in violation of the Fifth and Sixth Amendments.[1] For the reasons stated below, the Defendant's motion is DENIED.

I. Facts

On August 23, 2006, Immigration and Customs Enforcement (ICE) officials executed a search warrant on the Defendant's home in connection with their investigation of a group of thirteen child pornography websites and the websites' subscribers. (Tr. at 11, 17-18.) The search warrant was based on information ICE agents possessed

---

[1] The Defendant had also moved for an order suppressing physical evidence seized at his house and any statements made as fruit of the poisonous tree. The Court has denied the motion to suppress physical evidence and the Defendant's motion to suppress statements to the extent that the motion was based on the fruit-of-the-poisonous tree argument. However, the Court reserved its ruling on the admissibility of the statements pending a March 27, 2008 hearing on the issue of whether the statements were made in violation of the Fifth and Sixth Amendments.

1

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

indicating that the Defendant was a subscriber. (Tr. at 15.) The Defendant's wife and children were at home during the search, but the Defendant was not. (Tr. at 20.) The agents conducting the search were in plain clothes and had no weapons drawn at any time. (Tr. at 20.) During the search, the Defendant's wife spoke to the Defendant on the telephone and informed him that agents were executing a search warrant for computers at the house. (Tr. at 24-25.) Agent Raudenski also spoke to the Defendant while at the residence and told him that the agents wanted to interview him. (Tr. at 25.) Due to the sensitive nature of the topic of child pornography, Agent Raudenski preferred to interview the Defendant at his home so that the Defendant would be most comfortable. (Tr. at 17, 26.) However, the Defendant informed Agent Raudenski that he was at work in Long Island and that it would take several hours to get from his place of work to his residence in Maybrook, and that he was not planning to return to Maybrook until the end of the week. (Tr. at 25.) As a result, the Defendant agreed to meet with Agent Raudenski later that day at the ICE office in Manhattan. (Tr. at 25.) During the conversation, Agent Raudenski did not tell the defendant that he was under arrest or that he would be placed under arrest if he did not meet with the agents, nor did Agent Raudenski make any threats or promises to the Defendant regarding his participation in the interview. (Tr. at 25-26.)

The Defendant then drove to the ICE office for the interview. (Def. 2/5/08 Aff. ¶ 6-7.) The approximately 20-story building in which the ICE office is located is not a government building, and there is no visible indication that there are any law enforcement offices inside, such as metal detectors or law enforcement personnel stationed at the door. (Tr. at 27-28.) Within the building, ICE occupies one entire floor and portions of

two other floors, and the building's other tenants include Hugo Boss, Tommy Hilfiger, Martha Stewart, fashion studios and costume design studios. (Tr. at 27.)

Upon arriving at the building, the Defendant followed the same procedure any visitor—i.e. attorney or interviewee—to ICE would go through, which is quite different from the procedure for an arrestee. (Tr. at 30-31.) The Defendant arrived before the agents and waited 15 to 30 minutes in the seventh floor reception area for them to arrive. (Beebe 10/12/07 Aff. ¶ 7, Tr. at 29.) The ICE reception area has two unlocked glass doors at the entrance and couches, chairs, coffee tables, and a glass booth where a security guard sits. (Tr at 28-29; Gov. Ex. 6-9.) The doors are unlocked, so visitors do not need to be buzzed in, and no law enforcement agents guard the door. (Tr at 28-29; Gov. Ex. 6-9.) ICE's practice is that the security guard issues all visitors with visitor's passes by asking visitors for identification and, as a security measure, retaining the identification as collateral to ensure that the pass is returned upon the visitor's departure. (Tr. at 30.)

When Agent Raudenski arrived, he greeted the Defendant in the reception area and accompanied him to the third floor via the building's public elevator. (Tr. at 31, 71.) They walked through a public hallway to another portion of the ICE office, which had a reception area like the one where the Defendant had been waiting. (Tr. at 32; Gov. Ex. 10.) Agent Raudenski led the Defendant through the main office area to a conference room where the interview was to take place. (Tr. at 32-35; Gov. Ex. 11.) Agent Raudenski used a swipe card to open two doors, but the doors were not locked from the inside, nor did Agent Raudenski lock any doors behind him. (Tr. at 32-33.) The Defendant did not pass any prisoners or holding cells. (Tr. at 34.)

3

The large, well-lit corporate-style conference room where the interview took place has an executive conference table in the center of the room, surrounded by approximately 15 leather swivel chairs and several credenzas. (Tr. at 35; Gov. Ex. 12-15.) Though there are interrogation rooms in the building, the agents did not use them for the Defendant's interview, nor was the Defendant ever taken to the area where the interrogation rooms are located. (Tr. at 36-37.)

Agent Raudenski and another ICE agent, Agent Fitzsimmons, both of whom were in plain clothes, sat with the Defendant at the conference table during the interview. (Tr. at 37-39.) The Defendant was never searched, fingerprinted or handcuffed during the interview, nor was he threatened, told that he was under arrest, or that he was not free to leave. (Tr. at 39.) Agent Raudenski informed the Defendant at the outset of the interview that he did not have to participate in the interview if he didn't want to, and the Defendant stated that he understood this and that he was willing to participate. (Tr. at 39-40.)

The Defendant asked two questions at the outset of the interview. He asked if he needed an attorney, to which Agent Raudenski replied that it was not his position to make that decision for the Defendant, but that he had the right to have an attorney present for the interview if he wanted one. (Tr. at 40.) The Defendant also asked if he was the subject of the agents' investigation. (Tr. at 41.) Agent Raudenski responded that the investigation was ongoing, and that, while the Defendant's name had come up in the investigation, the agents needed further information to determine whether he was involved. (Tr. at 41.)

The agents began by asking innocuous questions and progressed to discussing the Defendant's use of the internet for child pornography. (Tr. at 42.) At no point did the Defendant say that he did not want to answer the agents' questions, nor did he ask to leave. (Tr. at 41.) Among other things, the Defendant stated that he had seen child pornography on the internet and had downloaded from child pornography websites. (Tr. at 43-44.) Towards the end of the interview, Agent Raudenski showed the Defendant printouts of "screen shots" of the web site pages to which the agents believed the Defendant had subscribed, and asked whether he recognized them. (Tr. at 44-45.) Agent Raudenski had saved the screen shots in the course of the investigation of the websites; they were not obtained from any of the Defendant's seized computers and Agent Raudenski did not tell the Defendant that they were obtained from his computers. (Tr. at 44-45.)

Near the close of the interview, which lasted approximately one and a half hours, (Tr. at 41), Agent Raudenski asked the Defendant for consent to search his e-mail account. (Tr. at 47.) The Defendant verbally consented and also read and signed a consent form to that effect. (Tr. at 47.) When the agents told the Defendant that they might have follow-up questions, the Defendant said that he would be willing to answer further questions. (Tr. at 49.) The agents escorted the Defendant back to the seventh floor reception area, and the Defendant left the building unescorted, again using the common, public elevator. (Tr. at 49, 71.) The Defendant was formally arrested over two months later on November 3, 2006.

## II. Discussion

At the suppression hearing, Special Agent Nicholas Raudenski testified for the Government. The Defendant, who did not testify, submitted two affidavits in support of his motion which, in part, describe the circumstances of the interview which the Defendant contends rendered it custodial. Where a defendant does not testify at a suppression hearing, the Court should credit the live testimony over the Defendant's moving affidavit. *See, e.g. United States v. Al-Marri*, 230 F.Supp. 2d 535, 539 (S.D.N.Y. 2002) (valuing "the weight of live witnesses' testimony over the contents of a defendant's affidavit" because the defendant was not subject to cross-examination). The Defendant claims that the statements he made were the product of a custodial interrogation and that, since he was not advised of his *Miranda* rights during the interview, they must be suppressed. He also asserts that the statements were made in violation of the Sixth Amendment.

### a. Fifth Amendment

Law enforcement officials must advise an individual of his *Miranda* rights when the individual is subject to interrogation while "in custody." *See Thomas v. Keohane*, 516 U.S. 99, 112 (1995). An individual is in custody when, considering the totality of the circumstances, a reasonable person in the same situation would believe that he was not free to leave. *See id.* A custodial situation arises in circumstances where "inherently coercive pressures . . . tend to undermine the individual's will to resist and to compel him to speak." *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992) (internal quotation omitted). The inquiry is an objective one; the defendant's subjective beliefs or feelings

about the situation do not factor into the analysis. *See, e.g., United States v. Kirsteins*, 906 F.2d 919, 923 (2d Cir.1990). Where there was not a formal arrest, the question is whether there were restraints on the individual's freedom of movement to a degree associated with a formal arrest. *See Berkemer v. McCarty*, 468 U.S. 420, 441 (1984); *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

In this case, the Defendant was not in custody during the interview, and therefore *Miranda* warnings were not required. Considering the circumstances giving rise to the interview and the setting in which the interview took place, a reasonable person in the Defendant's position would believe that he was free to leave. The setting of the interview is simply not the type that can be considered inherently coercive. When the Defendant arrived, he was subject to the same procedures any visitor who was not being placed under arrest would follow. The Defendant states that he believed he could not leave because he had given his license to the security guard when he arrived at the building. Though the Defendant's subjective belief is irrelevant, it should be noted that from an objective standpoint, being subjected to ICE's practice for all visitors, including attorneys and interviewees, to obtain a visitor's pass by providing identification would not lead a reasonable person to believe that he was in custody. The Defendant waited in a public reception area for 15 to 30 minutes before the agents commenced the interview. He traveled through the common hallways and common elevators. The interview was conducted by two plainclothes ICE agents in a building that is predominantly occupied by commercial tenants and had no indications of containing law enforcement offices. In stark contrast to an interrogation room, the room where the interview took place was

large, well-lit, and furnished with comfortable corporate style furniture, including an executive conference table, leather swivel chairs, and several decorative credenzas.

In addition to the fact that the setting of the interview was entirely non-coercive, the agents conducting the interview did nothing that could be interpreted as coercive, intimidating, or restricting on his freedom of movement. There were no restraints placed on the Defendant at all, let alone those that would come close to reaching the degree associated with formal arrest. The Defendant was never searched, fingerprinted, or handcuffed, nor was he told that he under arrest or that he was not free to leave. In fact, Agent Raudenski actually informed the Defendant at the outset of the interview that he did not have to participate in the interview if he didn't want to, and the Defendant stated that he understood this and was willing to participate. In response to the Defendant's question of whether he was the subject of the investigation, Agent Raudenski told the Defendant that while his name came up in their investigation, the agents needed more information before determining the Defendant's involvement. In response to the Defendant's question of whether he needed a lawyer, Agent Raudenski answered that he had the right to have an attorney present if he desired one. The agents' agreeable demeanor along with all of this information the agents gave the Defendant would lead a reasonable person in his situation to believe that he was not in custody.

It is not enough that the Defendant subjectively believed that if he did not cooperate, negative consequences would follow. Nor does the fact that the Defendant's home was searched prior to the interview render him in custody, as the Defendant contends. Following the search, the Defendant voluntarily agreed to go to the interview and drove himself to the ICE office, unaccompanied by any law enforcement agents.

Agent Raudenski did not threaten the Defendant or make any promises to him should he decline the interview. Moreover, contrary to the Defendant's argument, the fact that agents showed the Defendant screen shots of the websites to which they believed he had purchased access did not give rise to a custodial setting. The agents did not tell the Defendant that the shots were taken from his computer or use any ruse to induce the Defendant to make statements. Even if they had, it would be unlikely to render this setting custodial. However, in this case, the agents merely showed the Defendant the screen shots obtained during the investigation and asked whether the Defendant recognized them. This legitimate means of questioning did not render the interview custodial.

Furthermore, the Defendant's own cooperative behavior is indicative of the fact that he was not in custody. At the end of the interview, which was only an hour and a half long, the Defendant indicated that he would be willing to answer any further questions the agents might have, and signed a consent form giving agents permission to search his e-mail account. The Defendant then freely left the building. The circumstances of the interview simply contain no indicia of a custodial setting, and a reasonable individual in the situation would have felt free to leave. Thus, the Defendant was not in custody during the interview and no *Miranda* warnings were required.

### b. Sixth Amendment

The Sixth Amendment right to counsel attaches only when adversarial proceedings are commenced. *See Davis v. United States*, 512 U.S. 452, 456-57 (1994) (citing *United States v. Gouveia*, 467 U.S. 180, 188 (1984)). The Defendant states in his Affidavit that

9

he asked the agents at the outset of the interview if he needed a lawyer and they said no. (Def. 10/12/07 Aff. at ¶ 10). The Court credits Agent Raudenski's testimony that when the Defendant asked whether he needed a lawyer, the agent replied that it was not the agents' position to make the decision for him, but that he had the right to have an attorney present if he so desired. However, even if the agents had told the Defendant that he did not need a lawyer, there would be no violation of the Sixth Amendment right to counsel, since at the time of the interview in August 2006 the Defendant was merely a suspect, and adversarial proceedings had not yet commenced. In fact, they did not commence until over two months later on November 3, 2006, when the Defendant was arrested. Thus, no violation of the Sixth Amendment arose.

### III. Conclusion

For the above reasons, the Defendant's motion to suppress his statements is DENIED.

*It is so ordered.*

Dated: May 15, 2008
White Plains, New York

Stephen C. Robinson
United States District Judge